May it please the court, Bradley O'Connell for Antwion Thompson. The two-step, Miranda in the middle, station house interrogation here is as plain an example as this court is likely to see of a deliberate two-stage strategy both undermining the effectiveness of the belated Miranda warnings under Missouri v. Siebert and of tainting the voluntariness of the belated waiver under Oregon v. Elstad. Let me first address the threshold question of the state's re-exhaustion argument as to Siebert. Even if we assume that the 1965 case of Blair v. California and a handful of similar cases still have some precedential value despite the subsequent Ninth Circuit decisions saying that they'd been superseded by intervening Supreme Court cases. Even if we accord them some precedential value at least within their immediate context, they're entirely distinguishable because this court has never required a petitioner to go back to state court and re-exhaust a claim in light of a Supreme Court decision rendered prior to the time of finality within the meaning of Teague. Can I put the re-exhaustion question aside for a moment? Yes, Your Honor. I'm actually more concerned about whether Missouri v. Siebert is a clearly established law. The cases you were citing for, well, we look at the cases, the Supreme Court precedents when the State's decision becomes final, are not really applicable. They're interpretations of 2255, which is the statute of limitations for when you can bring a habeas petition. Those cases are not applicable to the 2254d-1. And we have the case Lockyer v. Andrade, the Supreme Court decision, which says that the clearly established phrase refers to the holdings as opposed to the dicta of this Court's decision as of the time of the relevant State court decision. But because that thing, and we've repeated that in, you know, 20-plus opinions, the Supreme Court has repeated that language in its cases. And that seems to be consistent with EDCA's purpose, which is that we look at what was before the State court when it made its decision, not at some hypothetical time in the future when the State court wasn't deciding anything. So how do I deal with that? Your cases about when the decision becomes final are actually interpretations of 2255. Well, Your Honor, I think the Lee case, which used the reference to when the case became final, was a 2254d case. Mr. Williams does use that language in his case, but then it's reinterpreted by the Supreme Court in Yarbrough v. Alvarado, saying it refers to the holdings as of the time of the relevant State court decision by Williams. And Lockyer v. Andrade, of course, was after Williams. And so I feel like I'm sort of stuck with that language as of the time of the relevant State court decision, not sometime thereafter when the State court isn't deciding anything anymore. Your Honor, I think that in the Williams opinion, the Court used both phrases. And I think the reason it used both phrases is that the second phrase, time of the State decision, is simply a looser reference to the same thing as stated in Justice Stevens' opinion for the Court in Williams. I have two questions relative to this because I noticed the same problem. One is I don't understand this question to be in dispute in this case. That is, I don't understand the government to have ever argued that AEDPA applies to the question of the applicability of CBER. They're arguing it in a different way. They're arguing a re-exhaustion issue. But they've never doubted, as I understand it, nor did the district court, that the finality point was the 90 days after the California Court of Appeals decision. Is that right? That's absolutely correct, Your Honor. In the standard review section of the appellee's brief, the State quotes the identical language. I forget if it uses an exact quote or a paraphrase. But the exact passage from Justice Stevens' opinion for the Court in Williams v. Taylor. Well, it's an interesting question and it troubled me as well, but it doesn't necessarily seem to be presented here. Your Honor, I agree. I read the State's brief as explicitly acknowledging that the relevant point for AEDPA is the time of finality. And, of course, this Court has repeated that formulation, including the at time of finality phrase, in 2254 cases, including, I believe, Butler v. Curry and a couple others which I cited in the brief. I don't know a case in which it ever matters. That's what's interesting. I agree, Your Honor. I've never seen a case like this in which it would have mattered if it were the last Court of Appeals decision or the 90 days afterwards. I would say the case in which it mattered. Well, Your Honor, I think considering the way the issue has been framed before the Court, given that there has not been an argument raised by the State, I think the Court should proceed on the terms that the Court has stated before, albeit in different contexts, but the Court has repeated that formulation before. The State's brief has not challenged it. And then the other thing that was interesting here is that the State Supreme Court was essentially unnoticed. The argument was made directly to it that Seabird is pending and you ought to wait. That's right, Your Honor. Supreme Court has a procedure which it uses very commonly where there is a lead case pending. In this case, not only was Seabird pending, but by the time the State Supreme Court petition was filed, Seabird had already been argued. I was sort of struck by the State Court saying that we have to apply the Supreme Court precedent as it currently exists, which is sort of the point of EDPA. But my other question was, the Supreme Court has said the State can waive this bar on opinions, Supreme Court decisions that come out after the State Court decision. But I'm a little hard-pressed to say that the State has waived that issue, because their argument is that Missouri v. Seabird is not applicable, is not as clear a precedent that we should consider in looking at this case. Now, do you think you can make an argument that the State has waived this issue, the Missouri v. Seabird? Yes, Your Honor, because I think that we should meet the State's argument on the State's terms. And the State has argued this strictly as a re-exhaustion question. Not only has it not disputed the EDPA timing question, but the phrasing of its appellee's brief right there framing the argument in the preliminary standard review section, which, of course, this Court's rules require, because it's so important, the State uses the time of finality. So the State's argument for not applying Seabird is strictly a re-exhaustion argument, not an EDPA argument. And — All right. So I do think this is in some ways an interesting issue in the case. But to go on to the merits for the moment, the — my strongest or question I would like you to answer about the merits is why don't we remand as in Williams? And remand to the district court? There would not be — there would be nothing preventing that, Your Honor. However, I think we have such a plain record here. We have — But there's no factual determination of deliberateness, meaning we deliberately didn't give the Miranda warnings as opposed to we deliberately — they certainly deliberately interviewed him at length in a complete interrogation before they gave Miranda warnings. And there was no other explanation for it. I agree with that. Still, we would be plugging a hole. We would be making a determination — well, two holes, actually, as to deliberateness when there's been no fact-finding as such, even if we think it's an inevitable determination. And secondly, there's a second inquiry, which is under Williams, at least, of whether or not the second set of warnings were dissipated, whatever the problem was. And that may be a pretty easy inquiry as to the second interrogation, but as to the next day, I'm not sure it's that straightforward. Your Honor, Siebert tells us that even as to the deliberateness question, we look at objective factors primarily. If there is subjective evidence, that's great, but because the Supreme Court recognized that we're rarely going to have as candid police admissions as you had in Siebert itself, we're going to look at objective factors. And Williams, in turn, has, in itemizing those objective factors, has given us a list of things that really are not reasonably susceptible to dispute on this record. But what about as to the reenactment the next day? Your Honor, as to that, we still have continuity of police personnel. We still have an overlapping content. But I'm not asking you the outcome. I'm asking you how we could do it without finding facts. I think that the undisputed aspects of this record compel a conclusion that they were so integrally related, especially because you remember that in the interrogation itself, the detectives are emphasizing that, and we need you to come out into the field with us. And that once they have initially, in the un-Mirandized part of the interrogation, gotten out his admission, immediately they begin introducing the idea that they need to go out into the field. They need him to accompany them. They need him to show them where he disposed of the knife and everything that was later found this way into the reenactment video. We also have a situation that, although it's taking place the next morning, we had him out, because actually they attempted first the reenactment that night. It was not videotaped, and nothing much seems to have come of it. But by the time he got back to the station, by the time he actually got booked in the jail, it's 2 or 3 a.m., he was on suicide watch at the jail, which meant is not only testament to the- You see, that fact, the fact that they attempted the reenactment that night, which I did not know, seems like a pertinent fact as to the continuity and so on. So you'd want that in the record. It is in the record, Your Honor. You'd want to know about it, and you'd want to evaluate it. It is in the record, Your Honor. It is in the testimony at the suppression hearing that they did take him out into the field. Well, no, but they didn't take him to the house to do a reenactment. I don't believe they took him to the house. I believe they took him to some locations near what sounds like sort of a culvert of some type in that part of Contra Costa, attempting to find- Find the knife. Exactly, Your Honor. All right. You are out of time. We will give you some time in rebuttal. Thank you very much. Thank you. Good morning, Your Honor. With respect to the first question, it's true that Williams says the rule of law clearly established at the time that the State court conviction became final. And because it's been held that finality for purposes of the ADPA in terms of the one-year limitations- Did you ever argue anything about this? Pardon me? Didn't you- wasn't it common ground all the way through this case? No, we didn't. I agree, Your Honor. We did not- So why- We rested on exhaustion. I understand that. So how can we reach this question? It hasn't been briefed as such. It's interesting and complicated. Why are we dealing with it now? Well, I had planned to argue exhaustion, and I still think that this case is unexhausted. And I don't think this Court can reach the Siebert issue without violating principles of exhaustion. The State court, even though it knew certainly that Siebert was pending, it certainly was not a clearly established law at the time that the State court rendered its decision and at the time that the State Supreme Court denied review. And Appellant still had State remedies. He wasn't deprived of State remedies. He could have petitioned for cert, which he failed to do, even though he was aware that Siebert was pending. That is somewhat mysterious. I agree with you. And he also could have filed a petition for writ of habeas corpus. That was very commonly done after Blakely, after Crawford. There is absolutely no explanation for why he didn't- But the precise argument was made. I mean, the precise argument that they're making now, I mean, as a qua-argument, including the word deliberate, I looked at it, was made to the California Supreme Court. And the California Supreme Court was told the case is pending or the case has been argued. Why don't you wait for it? So it wasn't as if this was any mystery to somebody reading the petition. And to ask him to go back and do it all over again, when he basically told the California Supreme Court all it needed to know about both the content of the argument and the fact that there was going to be a Supreme Court case down any minute dealing with it, seems a little excessive. Well, Your Honor, except that that Supreme Court decision could have gone either way. We don't know how that Supreme Court decision was going to go. And so to hold that somehow- Well, we hold cases all the time. If there's a Supreme Court case pending, we wait. And if they didn't wait, presumably it's because they thought it didn't matter which way it came out. Well, Your Honor, they may have-they could have held it, but I don't think in terms of exhaustion principles that there's any requirement that the state court hold it. The state court is under- Well, Your Honor, there is a jurisdictional limitation on the California Supreme Court in terms of petitions for review. It's statutory, and they have to grant or deny review within a statutory period of time. So is the state waiving the argument that Missouri v. Seabird was not clearly established at the time  the state court rendered the decision? Is the state-because the state does have the power to waive that, and then we would apply Missouri v. Seabird to the state court's decision. So are you waiving that argument? Well, I have to admit, Your Honor, we did not raise it. So- Are you waiving it on behalf of the state? I don't feel I'm in the position to waive it on behalf of the state, but I have to acknowledge, as Justice Bresson pointed out, that we did not raise that in our brief. And you more than didn't raise it. I mean, you assumed its nonexistence. I think that's correct, Your Honor. But in terms of the state position, I can't stand here and say the state is waiving that argument. What about Seabird was new and surprising to the state? Well, I think that before Seabird, Elstad really looked at was the Miranda voluntary and knowing. And if it was voluntary and knowing, that the period of time between it wasn't- Well, Elstad may have been tiptoeing away from the earlier Miranda law that had been developing, but the Supreme Court hadn't abandoned Miranda. And in Seabird, they sound like they really mean not to abandon it. But what's so new about it? What has to be exhausted about raising the- In Seabird, Justice Kennedy, who decided the case on the narrowest ground, says that the initial and most important issue to look at in the Seabird situation is the deliberate nature of the police conduct. And there was nothing under Elstad that addressed the basically subjective intent by the police officers. But the Missouri Supreme Court- Was it Missouri that Seabird came from? Yes, Your Honor. Had held, applying Elstad or knowing about Elstad, that that sequence was not in compliance with Miranda. So presumably the California Supreme Court could have done it, too. The California- Certainly the California Supreme Court could have done it, Your Honor, but it wasn't compelled by then-existing Supreme Court presidents. Well, that may be, but that's not the standard for exhaustion. You see, now you are wrapping back into the other problem. Because the exhaustion question was, did they have a fair shot at the issue? And the answer is, sure, they did. They were specifically arguing, was specifically made, the fact that the Missouri Supreme Court had held this was specifically told to them, the fact that the Supreme Court had the case before it was specifically informed to them. And so what was their problem? They could have done what the Missouri Supreme Court did. They chose not to do it. But in terms of whether they had a fair shot at the case, they certainly did. Well, I would disagree, Your Honor. I think the California Supreme Court felt compelled by Elstad. And, I mean, certainly just looking at Siebert itself, given the division among the U.S. Supreme Court, I don't see how one could say that this was such a clear-cut issue. But the point is it doesn't need to be clear-cut for that purpose. It needed to be a reasonably decent argument using the existing cases, and it was. And, in fact, it was accepted by the Missouri Supreme Court without their believing that they were violating any Supreme Court law in doing it. And all the opinions, the majority opinions in Siebert said they weren't overruling Elstad. They specifically said they weren't. No. Elstad was not overruled. It was limited, though. And most courts in the California Supreme Court followed Elstad, I think, to the letter and to say that the Supreme Court, you know, the Missouri case went to the U.S. Supreme Court that granted review. There was a lot of division among that court. We only had a plurality decision. I submit this was not such a clear-cut case. It was the ---- Do you want to address the merits at all? I would like to address, Your Honor, the reenactment which you brought up. And I think certainly even if you apply Siebert in this case, that the reenactment was at a different time many hours later. It was at a different place. It involved, although it involved the same officers, it was a different situation. The defendant was Mirandized. Was he Mirandized? It's not in the transcript. Yes. All that's in the transcript is a Mirandized. Not in the transcript. It was in the transcript of the hearing, the hearing on Miranda. And I could give you the page. Well, it was a little peculiar because there was at the end of the transcript of the reenactment, he says, I'm going to Mirandize you again. But it was at the end. Right. But at that time, the officer stated that as we told you this morning, and then at the hearing on Miranda ---- I don't think they said this morning. I think they said before. And I thought it could have been referring to the day before. No. It was that morning at 10, I think exactly 1048 or 1058 a.m. And the officer testified that he Mirandized him, told him that he was not required to participate in the reenactment, that if he didn't want to do it, he didn't. And then he read him his Miranda rights from the card that morning. The defendant waived them. And his only concern was that he wanted lunch. And he agreed to go along with it. And then one ---- Is the testimony ---- because the day before, the ---- I mean, exemplifying how the whole thing was just running into each other, the defendant never really waived it or said anything, I mean, after the Miranda. Is the evidence at this time he did? Again, the officer said that the ---- like you said, it's not on the tape, but the officer agreed that he waived or the officer testified that he waived him. And at the end, in the transcript itself or in the tape itself of the reenactment, the officer tells him, reaffirms that they went over Miranda in the morning and that he was doing the reenactment with those waivers in mind. And if I could bring up one last thing. If, again, based on our assertion that it's not exhausted, I think this case definitely needs to be remanded because, as in Williams, it is a factual issue. And I think because the State court, in our opinion, has not had a ---- it was not fairly presented, we submit that the State ---- it should be remanded to the State court. Well, I've never heard of that procedure. Well, you're ---- Or it should be dismissed as unexhausted. Well, that's a different question. Yes. Do you think there's any argument at all, any way that anybody on this record would find this not deliberate? Well, Your Honor, I think, as we argued in our brief end, as the district court judge found, this is very unusual circumstances in that the defendant is the one who summoned the police. The defendant is the one who basically tried to say that he found him. The trial court did find that he was in custody at the relevant time. And once you have that, how could one conclude on this record that it wasn't deliberate to go through the entire interrogation, then give him the Miranda warnings, then go through the same interrogation essentially a second time? Well, although the ---- although the courts found that it became custodial within the middle or actually more towards the end of the interrogation, I think you ---- it's arguable that the officers themselves didn't have to necessarily know that. But again, even if there is a deliberate ---- He could have been in the police station for 10 hours or 12 hours or something by then. Voluntarily, Your Honor. I don't think that there's any reasonable argument that that was custodial until the time that the state court stated that it was. He went to the police station voluntarily. The officers told him he could leave at least three times before they started the questioning. But not after he got in the little room. Yes. When the officers arrived and when they actually took him into the interrogation room, the officers apologized to him for taking so long, explained to him that they were doing other things and testified what they were doing. And they told him in the tape, in the interrogation room, if you don't want to do this now, you can leave. Do you want to come back tomorrow? But again, you're not contesting the custody determination by the trial court as of the point that he made the determination. True, Your Honor. We're not. All right. Thank you very much. Thank you very much, Your Honor. Okay. We'll give you two minutes. Thank you, Your Honor. Let me first address an aspect of California procedure that Appellee's counsel brought up. She mentioned that there's a deadline for the California Supreme Court to act on a petition for review. There also is a rule of court which is applied all the time. It's called a grant and hold. The court simply grants review and its order specifically says the case is being held pending a lead case. There are no briefs. It just sits on the court's docket until the lead case is decided. So not only was there a procedure available, it's not an obscure procedure at all. It is used all the time. And they asked for it. They asked it to be held in the petition. Yes. And the petition specifically mentioned, as Your Honor mentioned, the dependency of Siebert. It gave the docket number. It discussed the reasoning of the Missouri Supreme Court opinion. So it was all right before the court. Turning to the question of deliberateness, although Siebert says we're rarely going to have candid admissions, we were trying to circumvent Miranda, we have a record here that comes pretty close. In the excerpts of record volume two, pages 113 to 114 and pages 135 to 136, the detective acknowledges that although he had all this incriminating evidence on Mr. Thompson, especially as Thompson was digging himself in progressively deeper, he said that he did not formally arrest him because he wanted to keep him talking. So that is about as – when one combines that with all the objective circumstances, I think that is as compelling a case of deliberate use of the strategy as the court found in Siebert itself. Now, I realize the court has concerns about the reenactment. It is hard to see how even a asserted off-the-record Miranda advisement that morning could have dissipated the taint when you have a complete interlocking throughout that entire reenactment. The two detectives, the same two detectives who participated in the late night interrogation, are repeatedly referring back to the interrogation the night before. And there's – You said this, you said that. Is this where that happened? Exactly, Your Honor. And the court knows from our Elstad argument all the things which the detectives had already done to suggest to him that you've done yourself a favor. You've done – that we were operating initially from a presumption of murder, but it's different if it's a lover's quarrel. All those things are still coming to bear. All right. You've used your time. But thank you very much. Thank you, Your Honor. The case of Thompson v. Runnell is submitted. Thank you both for a useful argument.
judges: Goodwin, Berzon, Ikuta